AO 91 (Rev 11/11) Criminal Complaint

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
**FILED**
*July 09, 2020*
David J. Bradley, Clerk of Court

United States of America
v.
Joshua Thomas Argires

*Defendant(s)*

Case No. **4:20mj1211**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 2020 to the present__ in the county of __Harris__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1014 | False Statements to Financial Institution |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Engaging in Prohibited Monetary Transactions |

This criminal complaint is based on these facts:

See attached affidavit of probable cause

☑ Continued on the attached sheet.

*Complainant's signature*

Postal Inspector Kyle Shadowens, USPIS
*Printed name and title*

Sworn to before me telephonically.

Date: July 09, 2020

*Judge's signature*

City and state: Houston, Texas

Magistrate Judge Dena Hanovice Palermo
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, U.S. Postal Inspector Kyle Shadowens, being first duly sworn, state:

## INTRODUCTION

1. I make this affidavit in support of a criminal complaint establishing probable cause for the arrest of Joshua ARGIRES for committing the following offenses in the Southern District of Texas between April 2020 and the present:

    a. 18 U.S.C. § 1014, False Statements to a Financial Institution;

    b. 18 U.S.C. § 1343, Wire Fraud;

    c. 18 U.S.C. § 1344, Bank Fraud; and

    d. 18 U.S.C. § 1957, Engaging in Prohibited Monetary Transactions.

2. As described below, there is probable cause to believe that ARGIRES committed the above-listed offenses in connection with a bank and wire fraud scheme targeting the Paycheck Protection Program, a program created to address the economic fallout of the COVID-19 pandemic by providing forgivable loans to small businesses.

## AGENT BACKGROUND

3. I am employed as a federal law enforcement officer by the United States Postal Inspection Service. I have been employed as a federal law enforcement officer since 2013, and I am currently assigned to the Financial Crimes/Mail Fraud team in the Houston Division of the United States Postal Inspection Service. I am responsible for conducting and have conducted many investigations into fraud, identity theft, and related "white collar" offenses. I have been licensed as an attorney by the State Bar of Texas since 2010, and I am a Certified Fraud Examiner. I have received training in how to investigate numerous Postal crimes, but primarily those involving

identity theft, mail fraud, wire fraud, bank fraud, and related "white collar" offenses. I am authorized to obtain and execute Federal Arrest and Search Warrants.

4. The information presented in this affidavit is based on my own personal investigation and the investigation of other law enforcement officers, which was communicated to me orally or via written communication. The facts set forth do not constitute all that has been learned in the course of the investigation but only enough to establish that probable cause exists for the issuance of a complaint and arrest warrant for ARGIRES.

## OVERVIEW OF THE SCHEME AND THE PAYCHECK PROTECTION PROGRAM

### *Overview of the Paycheck Protection Program*

5. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

6. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive

under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

7.     A PPP loan application must be processed by a participating lender.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA).  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

8.     PPP loan proceeds must be used by the business on certain permissible expenses payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### *Background of ARGIRES and Overview of the Scheme*

9.     ARGIRES is a resident of the Houston metropolitan area, in the Southern District of Texas.  In or about April 2020, ARGIRES submitted two materially false loan applications to financial institutions in order to wrongfully obtain funds from the PPP program.  On both applications, ARGIRES claimed that the business entities seeking the loans had numerous employees and significant payroll expenses.  However, neither entity had any employees, and neither paid any wages.  Because of these misrepresentations, ARGIRES was able to obtain over $1.1 million in PPP loan funds that he would not have been provided had he been truthful.

### Relevant Financial Institutions and Related Entities

10.    Credit Union 1 is a federally insured financial institution and a member of the federal home loan bank system. Credit Union 1 is an approved SBA lender and has participated

as a lender in the PPP. Credit Union 1 received a PPP loan application on behalf of Texas Barbecue, LLC ("Texas Barbecue").

11. Bank 1 is a federally insured financial institution. Bank 1 is an approved SBA lender and has participated as a lender in the PPP. Bank 1 received a PPP loan application on behalf of Houston Landscaping, LLC ("Houston Landscaping").

### The PPP Loan Application to Credit Union 1

*Background Relating to the Application*

12. According to information received by Credit Union 1, on or shortly after April 20, 2020, a PPP loan application was submitted to Credit Union 1 on behalf of Texas Barbecue ("Credit Union 1 PPP Application"). This application requested a PPP loan in the amount of $956,250.

13. The Credit Union 1 PPP Application identified Joshua ARGIRES as the 51% owner of Texas Barbecue.

*False and Suspicious Statements on the Credit Union 1 PPP Application*

14. Investigation has revealed that numerous statements on the Credit Union 1 PPP Application appear to be false and suspicious.

15. On the Credit Union 1 PPP Application, the applicant claims that Texas Barbecue has 51 employees and an average monthly payroll of $382,500. However, investigation indicates Texas Barbecue actually has no employees, no payroll, and no revenue.

16. By rule, Texas employers must submit reports of wages paid to the Texas Workforce Commission ("TWC"). Employers in Texas must also provide information about newly hired workers to the TWC within 20 days of hiring. Further, all Texas employers must

establish an unemployment tax account with the TWC. State law requires that employers in Texas pay unemployment tax on each eligible employee.

17. Records from the TWC indicate that Texas Barbecue has never reported any wages for any employee. These records also show that Texas Barbecue has never reported a hire, nor has Texas Barbecue ever paid any unemployment tax. These facts lead investigators to believe that Texas Barbecue has never paid any wages to anyone and has never hired an employee.

18. Additionally, records were obtained from the Texas Comptroller of Public Accounts ("Texas Comptroller") relating to Texas Barbecue. Texas Barbecue submitted annual franchise tax reports to the Texas Comptroller for calendar years 2016, 2017, and 2018. In all three years, Texas Barbecue's annual revenue was reported as zero dollars. No annual franchise tax report has yet been filed for calendar year 2019.

19. Furthermore, investigators have not been able to find any evidence of any business activity by Texas Barbecue. In fact, Texas Barbecue did not have a known bank account until approximately May 4, 2020, which is after the date on which the Credit Union 1 PPP Loan Application was approved. To date, the only deposit into that account has been the PPP loan itself. There is no evidence of any business activity being conducted via that account.

20. Texas Barbecue appears to have a very limited online presence. The entity has a website, txbarbecue.com, which lists some general information about Texas Barbecue's putative products for sale. The website has an online purchasing portal, but when a user tries to access it, the website states that "our online store is currently closed due to the COVID-19 pandemic." The website also states "new locations opening soon!" but provides no address or details about any business locations. In fact, the only address listed is a post office box on Richmond Avenue, discussed in paragraphs 22 and 24, below. Although the website is operational, it provides very

few details about Texas Barbecue's purported business operations. Additionally, investigators were not able to identify any reviews or comments about Texas Barbecue on any online platforms. Such online reviews are common for operational barbecue entities.

21. ARGIRES also holds personal checking and savings accounts at Credit Union 1. Between December 2019 and June 2020, the balance of ARGIRES' personal checking account never exceeded $750, and the highest balance in ARGIRES' personal savings account was $1,525. There are no transactions in either of ARGIRES' accounts that appear to relate to Texas Barbecue in any way. These modest balances and the lack of account activity are improbable for an individual who claims to be a 51% owner in a company with monthly payroll expenses of $382,500.

22. Additionally, the average monthly payroll $382,500 for 51 employees equates to average wages of $7,500 per month, or $90,000 annually, per employee. Such a high average salary for a barbecue operation raises further suspicion.

23. The Credit Union 1 PPP loan application lists a business address of 1319 Richmond Avenue, Unit 667573, Houston, Texas 77006. The 1319 Richmond Avenue address corresponds to a post office. Unit 667573 is a post office box inside that post office.

24. This post office box is the only address claimed for Texas Barbecue. Even so, the Credit Union 1 PPP Application states that two purposes of the PPP loan are "lease/mortgage interest" and "utilities." But investigation indicates that Texas Barbecue does not have a physical business location, and therefore, has no lease, mortgage interest, or utilities to pay.

25. Postal records indicate that post office box 667573 is used by ARGIRES in his personal capacity, is listed by ARGIRES as the business address for certain other entities in addition to Texas Barbecue, and is also used by an associate of ARGIRES.

### *Disbursement and Use of the PPP Loan Funds from Credit Union 1*

26. The Credit Union 1 PPP loan was in fact funded. But at the time the loan was approved, Texas Barbecue did not have a bank account.

27. On May 4, 2020, ARGIRES opened a business account on behalf of Texas Barbecue, also at Credit Union 1. On May 8, 2020, the newly established Texas Barbecue account received a PPP loan deposit of $956,600.[1] This was the first deposit into the Texas Barbecue business account, and it remains the only deposit into that account to date.

28. On or about May 17, 2020, ARGIRES opened a cryptocurrency account in the name of Texas Barbecue at Coinbase, Inc. ("Coinbase"). Coinbase is an online platform that allows account holders to buy and sell cryptocurrencies, such as Bitcoin and Ethereum. Coinbase account holders can also store cryptocurrencies and United States dollars in their account "wallets," which function essentially like traditional bank accounts. Funds can be securely stored in these wallets and can also be transferred into or out of these wallets.

29. The user of the Texas Barbecue Coinbase account is listed as ARGIRES.

30. No business address is provided for Texas Barbecue in the Coinbase account.

31. For the Coinbase account, ARGIRES listed his birthday as January 1, 1970, which is false. He was born in 1991.

32. Beginning on May 19, 2020, ARGIRES began a series of transactions, ultimately resulting in the transfer of $956,250 into the Texas Barbecue Coinbase account. ARGIRES accomplished this through a series of five identical wire transfers.

33. First, on May 19, 2020, ARGIRES instructed Credit Union 1 to send a wire transfer of $191,250 from Texas Barbecue's Credit Union 1 account to Texas Barbecue's Coinbase

---

[1] Although the Credit Union 1 PPP Application requested a loan of $956,250, Credit Union 1 funded the loan in the amount of $956,600.

account. Credit Union 1 did as ARGIRES directed. This transfer was followed by four other wire transfers in the same amount, each executed approximately one week apart. Specifically, the additional transfers of $191,250 between Texas Barbecue's Credit Union 1 account to Texas Barbecue's Coinbase account occurred on or about May 26, 2020; June 2, 2020; June 9, 2020; and June 18, 2020. These five transfers collectively totaled $956,250.

34. Account records reveal that as of June 30, 2020, the $956,250 amount remains in the Coinbase account. Some of this money appears to have been invested in cryptocurrency, which generated a profit. No funds were transferred out of the Coinbase account.

35. For each of the five wire transfers discussed above, ARGIRES had to call Credit Union 1 to verbally request the wire transfer and to provide necessary account information. In two of these calls, which were recorded, ARGIRES made statements to Credit Union 1 representatives about the use of the funds in the Coinbase account. These statements appear inconsistent with ARGIRES' actual use of this money.

36. For example, during one of these calls, ARGIRES stated that the $191,250 amount was "for two weeks payroll," but there is no indication that this money was used for payroll expenses. First, as described above, Coinbase is a cryptocurrency exchange and storage platform. While Coinbase does permit business accounts, it does not provide payroll services. Second, no funds were ever withdrawn from the Coinbase account, as would be necessary if the funds were used for payroll. Third, as explained above, Texas Barbecue does not appear to have any employees and thus has no payroll expenses.

37. In another call, a Credit Union 1 representative asked ARGIRES his opinion of Coinbase. ARGIRES responded, "I don't really manage that aspect of it, but I believe it pays out employees, like, through that." This statement appears inaccurate. Evidence indicates that

ARGIRES has exclusive control of the Coinbase account. Indeed, ARGIRES is the sole user associated with the account, and there is no indication that anyone else manages this account for him. Additionally, the internet protocol address associated with several of the Coinbase account transactions appears to be associated with a physical location in or very near to a residence in Southwest Houston that investigators believe is associated with ARGIRES. Furthermore, ARGIRES' suggestion that the Coinbase account is used to pay employees appears false, as no funds were withdrawn from the account, but instead remained under ARGIRES' control. Also, as mentioned above, Texas Barbecue has no known employees.

### The PPP Loan Application to Bank 1

#### *Background Relating to the Application*

38.     According to information received by Bank 1, in approximately early April 2020, a PPP loan application was submitted to Bank 1 on behalf of Houston Landscaping ("Bank 1 PPP Application"). It appears that the Bank 1 PPP Application requested a loan in the amount of $481,875.

39.     The Bank 1 PPP Application identified ARGIRES as the authorized representative of Houston Landscaping.

#### *False and Suspicious Statements on the Bank 1 PPP Application*

40.     Investigation has revealed that numerous statements made in connection with the Bank 1 PPP Application appear to be false and suspicious.

41.     As part of the Bank 1 PPP Application package, ARGIRES informed Bank 1 that Houston Landscaping's average monthly payroll was $192,750.

42.     Records received from Texas state entities indicate that Houston Landscaping in fact has no employees, no payroll, and insufficient annual revenue to cover even one month of the claimed payroll expenses.

43.     As discussed in paragraph 15, above, employers in Texas must provide wage reports, give information about new hires, and pay unemployment tax to the TWC. Records from the TWC indicate that Houston Landscaping has never reported any wages for any employee. These records also show that Houston Landscaping has never reported a hire, nor has Houston Landscaping ever paid any unemployment tax. These facts cause investigators to believe that Houston Landscaping has never paid any wages to anyone and has never hired an employee.

44.     Additionally, records were obtained from the Texas Comptroller relating to Houston Landscaping. Houston Landscaping submitted annual franchise tax reports to the Texas Comptroller for calendar years 2017 and 2018. In 2017, Houston Landscaping reported zero dollars in revenue. In 2018, Houston Landscaping reported total revenue of $154,000. No annual franchise tax report has yet been filed for calendar year 2019.

45.     As mentioned above, ARGIRES informed Bank 1 that Houston Landscaping had average monthly payroll expenses of $192,750. Accordingly, Houston Landscaping's total reported revenue for calendar year 2018 would be insufficient to cover even one month of Houston Landscaping's purported payroll expenses.

46.     Several supporting documents submitted to Bank 1 in connection with the Bank 1 PPP Application also bear indicia of fraud. For instance, the applicant submitted three IRS Forms 941, which are quarterly federal unemployment tax returns. These returns are all in the name of Houston Landscaping. They are dated April 15, 2019; July 15, 2019; and April 15, 2020. Based

on these dates, investigators believe that the Forms 941 pertain to the first quarter of 2019, the second quarter of 2019, and the first quarter of 2020, respectively.

47.	Each of these Forms 941 indicates that Houston Landscaping has 15 employees. However, as identified above, Texas state records indicate that Houston Landscaping has never actually hired a single employee.

48.	The Forms 941 also list the total quarterly wages purportedly paid by Houston Landscaping. The Form 941 dated April 15, 2019, states that Houston Landscaping paid wages to its 15 employees in the amount of $182,428.55. The Form 941 dated July 15, 2019, claims the same number of employees but lists total quarterly wages of $588,724.69. The Form 941 dated April 15, 2020, identified total wages for the 15 employees as $121,282.23. There appear to be no Forms 941 for the third or fourth quarters of 2019.

49.	Investigators believe that the extreme variance in reported wages is suspicious. Although the putative total number of employees remained steady at 15, the wages claimed in the second quarter of 2019 are more than triple the wages in the first quarter of 2019 and more than quadruple the wages in the first quarter of 2020.

50.	The average monthly payroll claimed on behalf of Houston Landscaping in the Bank 1 PPP Application appears unreasonable. Total wages of $192,750 for 15 employees result in average monthly pay of $12,850 per employee, or an average annual salary of $154,200. Investigators believe that such high salaries for a landscaping company are extremely unlikely.

51.	Furthermore, as part of the Bank 1 PPP Application, the applicant also provided an IRS Form 940, which is an employer's annual federal unemployment tax return, in the name of Houston Landscaping. This Form 940 pertains to tax year 2019. The 2019 Form 940 lists Houston Landscaping's total annual payments to its employees as $771,153.24.

52. This reported annual payment amount is inconsistent with the average monthly payroll expenses claimed as part of the Bank 1 PPP Application. Total annual payments to employees of $771,153.24 would result in average monthly payments to employees of $64,262.77. This is approximately one-third of the average monthly wages of $192,750 claimed by the applicant as part of the Bank 1 PPP Application.

53. The Forms 941 and Form 940 all list the address for Houston Landscaping as 1319 Richmond Avenue, Unit 667573, Houston, Texas 77006. As detailed in paragraphs 22 and 24, above, this address pertains not to a business location, but to a post office box used by ARGIRES, several business entities connected to ARGIRES, and an associate of ARGIRES.

54. Furthermore, investigators have reviewed bank records pertaining to a business checking account at Bank 1 in the name of Houston Landscaping. ARGIRES is the only authorized signor on the account. For the entire calendar year of 2019, this account received approximately $114,000 in deposits. Many of these deposits appear to be transfers into the account made by ARGIRES himself. Additionally, in the first three months of 2020, the Houston Landscaping business account received total deposits of $17,478. These deposits are extremely low for an entity claiming monthly payroll expenses of $192,750 — indeed, these deposits are less than one-tenth of the claimed monthly payroll amount.

55. There is little indication of any potential wages paid out of the Houston Landscaping bank account to any employees. It does not appear that any regular payroll payments were made from this account at all. There are very few debits from the account in 2019 or 2020 that could even potentially serve as payments to individuals.

56. Investigators also reviewed bank records for a personal checking account at Bank 1 in ARGIRES' name. ARGIRES is the only authorized signor on the account. Between April 28

and June 24, 2020, ARGIRES received five payments totaling $10,098 from the TWC, all labeled as unemployment insurance. ARGIRES reported that his most recent employer was Greater Houston Landscaping, LLC. Texas state records indicate that Greater Houston Landscaping, LLC, is an entirely different entity from Houston Landscaping. ARGIRES has no known ownership interest in or current affiliation with Greater Houston Landscaping, LLC.

### *Disbursement and Use of the PPP Loan Funds from Bank 1*

57. The Bank 1 PPP loan was ultimately funded in the amount of $160,657. These PPP loan funds were deposited into Houston Landscaping's business account on or about May 1, 2020.

58. Investigators reviewed Houston Landscaping's bank records through the date of June 29, 2020. Between May 1, 2020 and June 29, 2020, there appear to have been no wage payments made from that account. Investigators were unable to identify any transactions for payroll expenses, mortgage interest payments, lease payments, or utilities, which constitute the only allowable use of PPP loan proceeds. Some debits were in fact made from the account during this period, but none of these appear to relate to any permissible PPP purposes.

59. Additionally, in June 2020, a series of ATM withdrawals was made from the Houston Landscaping business account. On or about June 14, 2020, a withdrawal of $1,000 was made from an ATM in Houston. Thereafter, five additional ATM withdrawals occurred, each for $1,500, and each at ATMs in Houston. These withdrawals appear to have taken place on or about June 18, June 21, June 25, June 26, and June 27, 2020.

60. As of June 29, 2020, approximately $152,156.80 remained in the Houston Landscaping business account at Bank 1.

## CONCLUSION

61. In total, evidence indicates that ARGIRES received over $1.1 million via his submission of two false PPP applications. Neither of the entities appears to have employees or to pay wages that are in any way consistent with the representations made in the PPP applications. Additionally, evidence suggests that the fraudulently obtained money is not being utilized for payroll expenses or for any other legitimate purpose authorized by the PPP.

62. Based on the foregoing, I submit that there is probable cause that, between April 2020 and the present, ARGIRES committed the crimes identified in paragraphs 1.a. through 1.d. Therefore, I request that a criminal complaint be issued, along with a warrant for ARGIRES' arrest.

## REQUEST FOR SEALING

63. I further request that the Court order that all papers in support of this complaint, including the affidavit and arrest warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Kyle Shadowens
United States Postal Inspector

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 9, 2020.

Dena Palermo

THE HONORABLE DENA HANOVICE PALERMO
UNITED STATES MAGISTRATE JUDGE